```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
MEGAN AINA,                                       :
                                                  :
                        Plaintiff,                :     05 Civ. 7553 (SHS)
                                                  :
        -against-                                 :     OPINION & ORDER
                                                  :
  THE CITY OF NEW YORK,                           :
                                                  :
                        Defendant.                :
------------------------------------------------------------------x
```

SIDNEY H. STEIN, U.S. District Judge.

**I.      Introduction**

Plaintiff Megan Aina brings this action against the City of New York pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq., and the New York State Executive Law § 296, alleging that she was subjected to a hostile work environment after she became physically impaired from tears in her meniscus in both her knees and a torn ligament in one ankle. Although Aina does not claim that her physical condition prevents her from working, she does assert that her impairment substantially limits her ability to walk and stand for any extended period of time.

At the conclusion of discovery proceedings, the City has moved for summary judgment pursuant to Fed. R. Civ. P. 56, contending that plaintiff's physical impairment is not substantial enough to be covered by the ADA and that the proof in this action fails to rise to the level of a genuine issue of fact as to whether she was subjected to a hostile work environment. As explained more thoroughly below, because Aina has not presented a triable issue of fact as to whether her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment," Cruz v.

1

Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (citations and internal quotation marks omitted), the City's motion for summary judgment is granted and the complaint is dismissed.[1]

## II.   Background

The following facts are taken from the record as viewed in the light most favorable to plaintiff, with all reasonable inferences drawn in her favor. In 1989, Aina began working with the New York City Human Resources Administration ("HRA") as a Medicaid Eligibility Specialist. (Aina Affidavit dated Mar. 31, 2006 ("Aina Aff.") ¶ 1.) Nine years later, she transferred to the Client Representative Unit within the HRA, where her "primary duty was inputting patient information submitted by different medical facilities into a computer in order to determine whether the patient was eligible for Medicaid coverage." (Id. ¶ 2.)

In 1999, Aina stepped into a pothole while walking and sustained a torn meniscus in both knees and a torn ligament in her right ankle. (Id. ¶ 3.) Aina had surgery on her right knee in January 2001 and on her left knee in July 2002. (Id. ¶ 5.) Aina's orthopedic surgeon – Stuart Remer – has classified Aina as having "a permanent partial disability." (Affidavit of Stuart Remer dated April 5, 2006, at ¶ 6.) He also acknowledges that Aina "is presently able to function through pain medication and cortisone injections from time to time." (Id.)

As a result of her condition, Aina needs a cane and knee and ankle braces in order to walk. (Aina Aff. at ¶ 4.) Even with their aid, she states she cannot walk more than half a block without experiencing pain. (Id.) Indeed, Aina applied – and was accepted – for the services of Access-A-Ride, a program operated by the New York Metropolitan Transportation Authority

---

[1] Aina also alleged that because of her disability the City failed to promote her to several positions for which she had applied. (Compl. ¶ 1.) However, plaintiff now concedes that she lacks sufficient evidence to state a prima facie case with regard to her failure to promote claim and does not oppose its dismissal. (Pl. Mem. of Law in Opposition to Summary Judgment dated Apr. 1, 2006, at 2.) Accordingly, defendant's motion for summary judgment is granted with respect to plaintiff's failure to promote claim.

which provides transportation for handicapped individuals.  (Id. ¶ 6.)  Currently, Access-A-Ride transports Aina to and from work.  (Id.)  Once she arrives at HRA, Aina admits that she is "still able to perform the essential functions of [her] work," including "get[ing] up and go[ing] to the printer and photocopy machine."  (Id. ¶ 9.)   Aina states," I wouldn't say [the injury] affected my responsibility with my job . . . So I do my job okay.  I drive myself in with a cane but I do my job every day."  (Transcript of Aina Deposition dated Feb. 6, 2006 ("Aina Tr.") at 43:24-44:2.)

Aina alleges several incidents of ridicule and harassment that she claims constitute a hostile work environment.  They are as follows:

After returning from medical leave in 2001, Aina alleges that her supervisor at the time – Veena Kulkarni – began to criticize her work performance on a regular basis.  On one occasion, Kulkarni threw a pile of files on top of Aina's desk while Aina was sitting there, causing some of the files to hit Aina and some to fall to the floor.  (Aina Aff. ¶ 10; Aina Tr. at 53:18-22.)  Aina complained about this incident to Kulkarni's supervisor, who replied that she could take more medical leave if needed and concluded: "It is not harassment for your supervisor to supervise." (Aina Aff. at Exh. 4.)

In April 2002, Aina was transferred to another HRA unit, where she contends supervisors Constant Ford and Marijke Lowe "embarked on a concerted effort to get [her] to resign."  (Id. ¶ 11.)  That effort included denying her request to work overtime (id.), and initially denying, but ultimately granting, permission to take a "floating holiday."  (Aina Tr. at 71:12-72:2.)  However, Aina cannot link that denial to her disability.  (Aina Tr. at 71:12-72:2; 106:16-19.)  In addition, Aina testified that her co-workers in the new unit would "often" gather to "jeer[] and point[]" in her direction.  (Aina Aff. ¶ 11.)  There is no evidence specifically how often this treatment

3

occurred.  (See id.)  Aina could not hear what her co-workers were saying during these incidents, and therefore she does not know whether what they were saying related to her alleged disability.  (Aina Tr. at 68:25-69:12; 73:25-74:2) ("I don't know what she's saying because I in my seat . . . Ms. Lowe would be telling them I don't know but they pointing in to my direction.  Sometimes I get up to retrieve something from the printer and I see all of them staring and pointing at me.")  Aina also describes one occasion when she was walking toward the restroom, and Ms. Ford "slammed the door in such a violent manner that it almost hit my knees."  (Aina Aff. ¶ 11.)

In March 2003, Aina was waiting outside the building to be picked up and taken home by Access-A-Ride when Ford passed her and said, "I don't see why you make such a fuss about your disability."  (Aina Aff. ¶ 12.)  Also, at some unspecified time, Ford asked Aina "why don't you look for another job."  (Id.)

In November 2003, Ford walked past Aina's cubicle and told her: "You're not going to leave this place until something terrible happens to you."  (Id.)  Ford did not say anything else during that conversation.  (Aina Tr. at 88:16-20.)  That same afternoon, while Aina was getting into the Access-A-Ride bus to go home, the bus driver told her that the driver of a waiting limousine was holding a piece of paper with her name on it.  (Aina Tr. at 88:21-89:19.)  Aina then looked out the bus window and saw the limousine driver, but she stayed in the Access-A-Ride bus and went home.  (Id. at 89:25-90:7)  She never learned who sent the limousine, although she speculates that it was sent by her co-workers.  (Id. at 89:25-92:12.)

In addition, one of Aina's coworkers – Gloria Foster – submitted an affidavit asserting that Ford "spoke to Ms. Aina in a very hostile manner" and "looked at Ms. Aina with extreme hatred in her eyes."  (Affidavit of Gloria Foster dated Mar. 31, 2006, at ¶ 7.)  Foster, however, fails to recount the details of any specific comments or instances in which Ford allegedly acted

4

with hostility toward Aina. (See id.) According to Aina, another co-worker named Catherine Ashby suggested Aina apply to work for a particular company that was hiring "disabled people." (Aina Aff. ¶ 15.)

On three occasions in December 2003, Aina's lunch was taken out of a communal refrigerator by an unknown person and discarded. (Id. ¶ 13; Aina Tr. at 85:1-86:19.) One day in January 2004, Aina "slipped and nearly fell" because of "a puddle of water spilled on the floor" near her cubicle. Aina found water on the floor near her cubicle again the following two mornings, as well as two additional mornings more than one year later. (Id. ¶ 14.) Aina never fell or injured herself in any way because of the water, and she never discovered how it got there or whether it was done purposefully by one of her co-workers. (Aina Tr. at 95:4-97:3.)

Plaintiff commenced the present action in August 2005. As noted above, the defendant now moves for summary judgment.

**III.    Discussion**

    A.    Summary Judgment Standard

Summary judgment is appropriate only if the evidence shows that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995); LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 171 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, the Court "is to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004); see also LaFond, 50 F.3d at 171. However, the party opposing summary judgment "may not rely on mere conclusory allegations or speculation, but instead

must offer some hard evidence" in support of its factual assertions, D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998), such that "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.'" Golden Pacific Bancorp v. F.D.I.C., 375 F.3d 196, 200 (2d Cir. 2004) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

    B.    <u>The Court Need Not Decide Whether Aina's Physical Condition is a Disability Covered By the ADA.</u>

As an initial matter, the parties contest whether Aina is in fact "disabled" within the meaning of the ADA. See 42 U.S.C. § 12102(2). This Court need not resolve this question, however, because even were the Court to find that Aina is disabled pursuant to the ADA, her claim cannot not succeed because – as explained below – she does not raise any material issue of fact that she experienced a hostile work environment, the only claim she now pursues in this litigation.[2]

    C.    <u>Plaintiff Did Not Suffer Ridicule or Harassment That Was Severe or Pervasive Enough to Constitute a Hostile Work Environment.</u>

    1.    *Legal Standard for Hostile Work Environment*

A hostile work environment claim requires a showing (1) that the harassment was "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and (2) that a specific basis exists for imputing the objectionable conduct to the employer. Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997) (internal citations and quotation marks omitted). The plaintiff must show that the workplace was

---

[2] The U.S. Court of Appeals for the Second Circuit has yet to recognize a cause of action for hostile work environment pursuant to the ADA. See Crawford v. New York Life Ins. Co., No. 04-1853, 2006 U.S. Dist. LEXIS 69585, at *23 n.4 (E.D.N.Y. Sept. 27, 2006). The Court assumes for purposes of this analysis that such a cause of action exists.

"permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment." Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (citations and internal quotation marks omitted); Leibovitz v. N.Y. City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001) (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986)).

This test has both objective and subjective elements: the misconduct shown must be "severe or pervasive enough to create an objectively hostile or abusive work environment," and the victim must also subjectively perceive that environment to be abusive. Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). As a general rule, incidents must be more than "episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Perry, 115 F.3d at 149 (citation and internal quotation marks omitted). Isolated acts, unless very serious, do not meet the threshold of severity or pervasiveness. Brennan, 192 F.3d at 318; see also Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998).

To decide whether the threshold has been reached, courts examine the circumstances of each case in their totality and evaluate the severity, frequency, and degree of the abuse. Harris, 510 U.S. at 23 (relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance"); see also Cruz, 202 F.3d at 570.

Finally, plaintiff must demonstrate that the conduct occurred due to her protected status. Alfano v. Costello, 294 F.3d 365, 377-78 (2d Cir. 2002). It is "important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or

7

correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals." Id. at 377.  See also Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) ("It is axiomatic that mistreatment at work . . . [including] subjection to a hostile environment . . . is actionable under Title VII only when it occurs because of an employee's sex, or other protected characteristic."); Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 440 (2d Cir. 1999) ("[T]o sustain a Title VII hostile environment claim [plaintiff] must show more – she must produce evidence that she was discriminated against because of her race.").  Accordingly, the Court will first address those incidents of alleged harassment for which there is no evidence of any connection to her alleged disability, and then it will turn to those allegations where there is some degree of connection.

> 2. *Alleged Incidents For Which There is No Evidence of a Connection to Aina's Purported Disability.*

Aina testified that her supervisor and co-workers at HRA "often" gathered to "jeer[] and point[]" in her direction.  (Aina Aff. ¶ 11.)  However "often" it took place, Aina could not hear what her co-workers were saying.  Her testimony on this point is as follows:

> And [Ford would] encounter a whole crowd around her would
> gather around.  Her hands is going in the air and she's pointing in
> my direction.  I don't know what she's saying because I in my seat.
> But when she, there was one particular employee that used to be in
> the full front of the line.  And you can hear the shouts and the
> carried on.  When the crowd, when she finished talking, the crowd
> is dispersed, because some of the crowd would go back with Ms.
> Lowe back to Ms. Lowe's desk.  Ms. Lowe always used to be in
> the full front.  About four or five people would be with Ms. Lowe.
> They go back with Ms. Lowe and Ms. Lowe would be telling them
> I don't know but they pointing in to my direction.  Sometimes I get
> up to retrieve something from the printer and I see all of them
> staring and pointing at me.

(Aina Tr. at 68:23-69:12.)  Because Aina could not hear what her co-workers were saying – and does not even definitively know that they were talking about her – Aina has no proof that 1) it was in fact ridicule, 2) it was directed at her, or 3) it was directed at her specifically because of her alleged disability.

Similarly, while Aina alleges that on three occasions in December 2003, her lunch was taken out of a communal refrigerator and discarded (Aina Tr. at 85:1-86:19), she stated that she does not know who did it or why.  (Id.)

In addition, Aina alleges that on five occasions in 2004 and 2005, Aina found a puddle of water on the floor near her cubicle.  (Aina Aff. ¶ 14.)  Aina never discovered how the water got there or whether it was done purposefully by one of her co-workers, or, if it were, whether it was put there because of her alleged disability (Aina Tr. at 95:4-97:3).

Aina also testified to several additional incidents for which she cannot demonstrate any connection to her alleged disability.  For example, Aina testified that Kulkarni threw a pile of files onto Aina's desk, thereby causing some of the files to fall on Aina and some to fall to the floor.  (Aina Tr. at 53:18-22; Aina Aff. ¶ 10.)  Aina cannot point to anything that Kulkarni said – or anything about the context of this incident – that suggests that the supervisor acted intentionally because of Aina's alleged disability.  She also testified that her supervisors denied her request to work overtime (Aina Aff. ¶ 11), and that she was initially denied, but ultimately granted, permission to take a "floating holiday."  (Aina Tr. at 71:12-72:2; 106:15-19.)  However, Aina admits she has no knowledge why she was denied the work or, initially, the holiday (id.), and therefore she has no knowledge whether the denial was due to her disability.

In each of the incidents set forth above, Aina has no support whatsoever apart from her own conclusion that any of the incidents were directed at her due to her physical condition.

9

Accordingly, the Court does not credit them for purposes of Aina's hostile work environment claim.  See Alfano, 294 F.3d at 377-78.

>   3.   *The Alleged Incidents That Are Related to Aina's Purported Disability Are Not Sufficiently Severe or Pervasive to Constitute a Hostile Work Environment.*

The testimony most directly related to Aina's purported disability pertains predominantly to the conduct of her supervisor, Ms. Ford.  Aina testified that one day in March 2003, while she was waiting outside the building to be picked up and taken home by Access-A-Ride, Ford passed her and said, "I don't see why you make such a fuss about your disability."  (Aina Aff. ¶ 12.)

Aina also testified that one day in November 2003, Ford said to her, "You're not going to leave this place until something terrible happens to you."  (Id.)  Although Ford did not explain this statement, a reasonable juror could infer that this statement was related to Aina's disability because it occurred on the same afternoon as the limousine incident described above.  (Aina Tr. at 88:21-23.)  While Aina can point to no evidence that the limousine was intended by a co-worker to be a comment on her disability, a reasonable juror might infer such intent.

Also, at some unspecified time, Ford allegedly asked Aina "why don't you look for another job."  (Aina Aff. ¶ 12.)   This statement does not by its words refer to Aina's physical condition.  Even if a juror for some reason chose to infer that Ford made such a comment because of Aina's disability, the mere suggestion to look for another workplace is at worst offensive, rather than "threatening or humiliating."  Harris, 510 U.S. at 23.

Aina also describes one occasion when she was walking toward the restroom, and Ms. Ford "slammed the door in such a violent manner that it almost hit my knees."  (Aina Aff. ¶ 11.) One such isolated and ultimately inconsequential incident – in the absence of even a single

additional occurrence of alleged physical aggression from Ford and no connection to plaintiff's alleged disability – does not raise a material issue of fact as to hostile work environment.  In addition, one of Aina's coworkers – Gloria Foster – has submitted an affidavit asserting that Ford "spoke to Ms. Aina in a very hostile manner."  (Affidavit of Gloria Foster dated Mar. 31, 2006, at ¶ 7.)  Moreover, Foster fails to recount the details of any specific comments or instances in which Ford allegedly acted with hostility toward Aina – and fails to provide any statements from Ford that suggest that her hostile tone related to Aina's alleged disability.  (See id.)

Assessing the totality of Aina's allegations pertaining to supervisor Ford – three comments and one door slamming over more than two years – there simply is insufficient evidence in the record from which a reasonable juror could conclude that Ford's alleged conduct created a work environment "permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of [her] employment," Cruz, 202 F.3d at 570 (2d Cir. 2000).

Aina also describes interactions with another co-worker, Christina Ashby, who would specifically broach the topic of Aina's purported disability and ask Aina whether she was looking for a new job.  Aina described one such conversation as follows:

> She would come to me and she would ask me when I'm leaving, why I don't leave.  There are jobs out there.  I should go and apply for the jobs out there.  The last time she came to me she was telling me that somewhere was taking on disabled people and I told her, I said if the City do not want to hire me in this condition, why you think that a company or organization outside is going to hire me in this condition?  And then is when she never returned, she returned but she never asked me such a question again.

(Aina Tr. at 75:16-25.)  When Aina was asked at her deposition about Ashby's tone during such conversations, Aina explained, "[Ashby] would just come to me on lunch time, Megan, why you

don't leave? Why you don't, it's a hostile work environment." (Id. at 76:17-19.) This explanation demonstrates that Ashby's questions were not intended as harassment, but rather were made out of concern for Aina. This testimony is ultimately unhelpful to Aina because even if Ashby offers one lay opinion that the workplace was hostile, this Court has assessed the totality of the circumstances, including the frequency and severity of the alleged conduct as well as its threatening character and whether it interfered with Aina's work performance, see Harris 510 U.S. at 23, and determined – as explained above – that Aina has failed to present a material issue of fact that the alleged harassment was severe or pervasive enough to constitute a hostile work environment pursuant to the high legal threshold governing such claims.

Accordingly, even viewing the facts in the light most favorable to plaintiff, Aina's claim must be dismissed.

      D.     <u>The Court Declines to Exercise Supplemental Jurisdiction Over Plaintiff's New York State Law Claim.</u>

As noted above, Aina also brings a claim pursuant to Section 296 of the New York Executive Law. In light of the dismissal of plaintiff's federal claims, the Court declines supplemental jurisdiction pursuant to 28 U.S.C. § 1367(c)(3) over Aina's New York state law claim. See United Mine Workers v. Gibbs, 383 U.S. 715, 721-29, 86 S. Ct. 1130, 16 L. Ed. 2d 218 (1966).

**IV.**    **Conclusion**

As set forth above, the Court finds plaintiff has not raised any material issue of fact as to whether she faced harassment that was sufficiently severe or pervasive to constitute a hostile work environment on account of her alleged disability. The Court also declines to accept supplemental jurisdiction over plaintiff's state law claim. Accordingly, the City of New York's

motion for summary judgment is granted, and the Clerk of Court is directed to enter judgment dismissing the complaint.

Dated: New York, New York
February 6, 2007

SO ORDERED:

Sidney H. Stein, U.S.D.J.